**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **LISA CLEWIS MAY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION 04-0695-WS-B** |
| | ) |
| **A PARCEL OF LAND,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This quiet title action is before the Court on the parties' dueling motions for summary judgment, to-wit: defendant United States of America's Motion for Summary Judgment (doc. 77) and plaintiff Lisa Clewis May's Motion for Partial Summary Judgment (doc. 88). The motions, which concern substantially similar factual and legal issues, have been briefed and are ripe for disposition at this time.[1]

**I.    Procedural History.**

Plaintiff Lisa Clewis May filed this action in Baldwin County Circuit Court in September 2004 against several *in personam* defendants, including the United States of America, seeking to quiet title in two related parcels of real property, one of which is merely a 10-foot strip.[2]

---

[1]    Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

[2]    The Complaint named several other defendants, including James W. May, Irene N. Trotter, John L. House and Shirley House, and also listed the two parcels as *in rem* defendants. None of these defendants have submitted Rule 56 motions or briefs. Trotter was dismissed from this litigation via Order (doc. 83) dated May 5, 2006, with the consent of all parties. The Houses, who are proceeding *pro se*, remain defendants of record, and it is apparently undisputed that they own an undivided one-half interest in the 10-foot strip. The Houses have elected not to be heard on summary judgment, despite being afforded an ample opportunity to do so. Defendant James May, also proceeding *pro se*, has submitted filings through Lisa May in which he disclaims any legal interest in the real property at issue herein. It appears that plaintiff seeks no relief as to the Houses and James May.

Together, these parcels comprise Lisa May's current homestead and residence in Magnolia Springs, Alabama.  The Complaint alleges that plaintiff holds title to the residence, but that the Internal Revenue Service ("IRS") wrongfully issued a federal tax lien on that property in June 2004 based on a federal income tax indebtedness that she does not have.  On that basis, the Complaint seeks a declaration that the federal tax lien is not valid, and that Lisa May holds the entire and undivided fee simple interest in the residence, subject only to a mortgage held by Irene Trotter, public rights of way, the Houses' one-half interest in the 10-foot strip, and any other rights that others may have to the bed, shores, and waters of the Magnolia River.

On November 1, 2004, the Government removed this action to this District Court pursuant to 28 U.S.C. § 1444.  Following a discovery period, the Government and Lisa May filed cross-motions for summary judgment.  The critical legal issue raised by those motions is whether the federal tax lien pertaining to the tax indebtedness of Lisa May's husband, James May, can properly attach to residential property to which Lisa May holds sole and exclusive title.  The Government maintains that the tax lien reaches the property because Lisa May is her husband's nominee, or alternatively because James May fraudulently transferred the property in an attempt to shield it from the IRS's collection efforts.  By contrast, Lisa May's position is that James May holds no legal interest in the property that is cognizable under Alabama law, and that the tax lien is therefore improper and invalid, irrespective of federal nominee principles.  Lisa May further contends that the Government's fraudulent transfer argument is time-barred and also fails on the merits.

## II.     Relevant Facts.[3]

---

[3]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005).  This standard will be followed with respect to each of the cross-motions for summary judgment.  Fortunately, there is virtually no dispute between the parties as to any material facts.  This is so notwithstanding plaintiff's nine single-spaced pages in her opposition brief (doc. 81) objecting to 36 of the 38 findings of fact proffered by the Government.  Plaintiff does not appear to contest the veracity of any of these facts.  Instead, she simply challenges their legal relevance by stating that such facts do not prove that James May owned a cognizable interest in the property under Alabama law, that he fraudulently transferred the property to avoid his income tax liabilities, or

**A.      History and Chain of Title for the Property.**

In April 1985, James May and his then-spouse, Kathryn May (who is not a party here), purchased certain real property (the "Property") in Magnolia Springs, Alabama, as joint tenants with rights of survivorship.  (U.S. Exh. 1.)[4]  James May and Kathryn May used the Property as their residence.  (U.S. Exh. 2, at # 3.)  In February 1989, James May transferred his interest in the Property to Kathryn May via Assumption Warranty Deed, in exchange for $10.00 and other good and valuable consideration.  (U.S. Exhs. 12 and 2, at #1.)[5]  James and Kathryn May continued to live on the Property after that transfer took place.  (U.S. Exh. 2, at #3.)

In 1991, James and Kathryn May divorced.  The Judgment of Divorce entered by the Baldwin County Circuit Court in June 1991 provided, in pertinent part, that Kathryn May "shall convey to all of her right, title and interest in and to the marital home which is currently in the name of [Kathryn May] only."  (U.S. Exh. 4, at ¶ 7.)  A careful reading shows that the quoted

---

that the Government's fraudulent transfer contention is timely.  Only rarely does plaintiff contend that a fact recited by the Government is not, in fact, true and correct.  In general, far from disagreeing with the Government as to what happened, plaintiff merely quarrels with the legal significance of those events.  Moreover, plaintiff's suggestion that the Government has failed to comply with Local Rule 7.2(a)'s requirement that proposed findings of fact be "appropriately referenced to the supporting document or documents filed in the action" is baseless, as the Government has carefully documented each fact which it recites by reference to appropriate record citations and exhibits.  There is no widespread LR 7.2(a) violation here, even though plaintiff ascribes same to nearly every one of the Government's proposed findings of fact.  That said, plaintiff has contravened Local Rule 5.1(a), which requires that filings be double-spaced, by submitting nine pages of single-spaced objections in the body of her memorandum of law.

[4]      The parties' summary judgment filings are rendered somewhat confusing by the lack of any markings identifying their exhibits by number, even as the parties use numbers in their briefs to reference such exhibits.  This omission can create ambiguities in the record as to which number corresponds to which exhibit, and renders it difficult to discern which exhibit a litigant (or this Court) is citing.  To alleviate such confusion in the future, counsel should take care to label each exhibit with an appropriate sticker or other marking before filing it.

[5]      James May testified that his financial position was "fine" in 1989 and that there were no creditors at that time "who were not paid or who were hounding" him, with the possible exception of the IRS.  (James May Dep., at 35.)  Other record evidence confirms that the IRS was in fact an exception to this statement, as the IRS had assessed tax liabilities against him of $15,166.23 on May 30, 1988.  (U.S. Exh. 5.)

language suffered from a typographical error, inasmuch as it failed to identify the person to whom Kathryn May was to convey her right, title and interest to the Property.  Nonetheless, James May avers that Kathryn May had agreed that he should receive the Property as part of the divorce property settlement, but that this document "omitted [his] name when it came to the provision about who was to get the Property."  (James May Aff., ¶ 6.)  He also admits that "[i]t is true that technically [he] got the house" in the divorce.  (U.S. Exh. 14, at 2.)[6]  Thus, despite the ambiguity in the divorce decree, it is undisputed that Kathryn May and James May agreed that he would receive the Property pursuant to their divorce in 1991.  In the meantime, James May proposed marriage to Lisa May, and they married soon after.  (James May Aff., ¶ 7.)  James May asserts that he gave Lisa May the Property as a "wedding gift," with no further elaboration as to his reasons or intent.  (*Id.*, ¶ 9; U.S. Exh. 3, at #1, #7; Lisa May Aff., ¶ 4.)  Rather than having Kathryn May deed the Property to him and then deeding the Property to Lisa May, James May felt that it was more efficient to have Kathryn May deed the Property directly to Lisa May.  (James May Aff., ¶ 10.)  This is exactly what happened.  On August 12, 1991, as part of the property settlement on divorce, Kathryn May transferred the Property to Lisa May, in exchange for a $9,000 payment by James May to Kathryn May.  (*Id.*; U.S. Exh. 2, at #2.)[7]  This figure represents approximately half of the equity that Kathryn and James May had accumulated in the Property prior to the divorce.  (U.S. Exh. 11, at 7, 12.)  At any rate, title passed directly from Kathryn May to Lisa May, without ever formally including James May, as Kathryn May executed an Assumption Warranty Deed for the Property in favor of Lisa May in August 1991.

---

[6]       James May was in dire financial straits at the time of his 1991 divorce.  As he wrote several years later, "At the time of the divorce what little liquid assets I had had been spent paying Katie's medical bills, rent, support, and buying her furniture and other things to set her up in her new apartment.  By the time of the divorce I didn't have any money left and had considerable outstanding liabilities."  (U.S. Exh. 14, at 1-2.)  He further wrote, "My income at the time of the divorce was not sufficient for me to pay all of Katie's bills and all of my bills."  (*Id.* at 2-3.)  Similarly, as of May 1994, James May represented that his current financial demands "far outstrip my present income."  (*Id.* at 3.)

[7]       The payment obligation was James May's, not Lisa May's.  (U.S. Exh. 2, at #6.)  Lisa May paid nothing for the Property.  The evidence before the Court is that James May paid the $9,000 in full to Kathryn May for the Property.  (*Id.* at #6, #10.)

-4-

(James May Aff., ¶ 12; Plaintiff's Exh. 2.)[8]

    James May continued to live at the Property after Kathryn May transferred it to Lisa May, apparently with no interruption in his residence.[9]  It is undisputed that James May has continuously resided at the Property from 1985 through the present, and that he currently lives there with Lisa May and their two children.  (U.S. Exh. 2, at #3a; U.S. Exh. 3, at #2a.)  There is no allegation or suggestion that James May has not enjoyed or does not continue to enjoy unfettered access to the rights and benefits of home ownership through his residence at the Property, or that any limitation has been placed on him in that respect.  Furthermore, although the Property is titled in Lisa May's name, the record reflects that James May pays all or substantially all of the day-to-day expenses incident to home ownership.  James May has personally paid the property taxes on the Property every year, purportedly at the request of and "on behalf of Lisa Clewis May."  (U.S. Exh. 2, at #3b; U.S. Exh. 3, at #2b.)  James May has personally made all mortgage payments on the Property since 1985, first on behalf of Kathryn May and later on behalf of Lisa May.  (*Id.* at #3c.)[10]  He has taken deductions on his personal

<hr />

[8]    James May represents that, as of the date of the transfer to Lisa May, he "was solvent and able to pay [his] debts as they accrued."  (U.S. Exh. 2, at #8.)  Given that the transfer occurred in August 1991, just two months after entry of the Judgment of Divorce, it is difficult to reconcile James May's statement in his affidavit that he was able to pay his debts as they accrued at the time of the transfer with his earlier statement that he "didn't have any money left and had considerable outstanding liabilities" at the time of the divorce.  Likewise, it is problematic that James May offered representations of solvency in his affidavit, after responding, "I do not remember," when asked in interrogatories about his assets and liabilities as of 1991.  (*Id.* at #4.)  These discrepancies cannot be resolved on summary judgment.

[9]    The Government points to the U.S. Bankruptcy Court's findings during James May's 1994 bankruptcy proceedings that there was no evidence of consideration for the transfer to Lisa May, and "there was a pattern of James May's putting assets in his spouse's name or of he and his spouse at the time of putting assets in his spouse's name."  (U.S. Exh. 11, at 12.)  But the parties offer no indication as to the factual basis of that "pattern," so there is no evidence in the record from which a factfinder in this case could find such a pattern.

[10]    In that regard, it bears noting that James May is listed (along with Lisa May) as a mortgagor for the Property in conjunction with a mortgage executed in September 1999. (U.S. Exh. 8.)  If, in fact, James May has no interest in the Property, then it is difficult to comprehend how he could be classified as a mortgagor with respect to that Property, given that he would have no interest to mortgage.  Additionally, correspondence in the record establishes that James May

income tax returns for those mortgage payments, as he and Lisa May file their tax returns separately. (James May Dep., at 70-77.) The utility and telephone bills for the Property are in James May's name, and he personally pays all such bills, purportedly on behalf of and at the request of Lisa May. (U.S. Exh. 2, at #3d; U.S. Exhs. 6 & 7; U.S. Exh. 3, at #2d.) Thus, despite the fact that she holds title to the Property, Lisa May does not now make, and has never made, payments for mortgage, property tax or utilities for the Property at which she, James May and their children reside.

In 1999, significant renovations were done to the Property. Lisa May asserts, "I paid around $180,000 for renovations in 1999." (U.S. Exh. 3, at #2e.) James May similarly states, "Mrs. May paid for those renovations." (U.S. Exh. 2, at #3e.) A closer look, however, exposes the fallacy of this characterization. Lisa May may have nominally paid for the renovations, but the funds did not originate with her. On the contrary, it is undisputed that she paid for the renovations using (a) borrowed money from mortgage refinancings, on which mortgage payments were made 100% by James May; and (b) "about $100,000" in monetary gifts from James May. (U.S. Exh. 2, at #3e; U.S. Exh. 3, at #2e.)[11] In the face of uncontroverted evidence that James May was the source of and responsible for every penny used to renovate the Property, the Court will not indulge the fiction that Lisa May personally paid for that work.

With respect to both the 1989 and 1991 transfers of the Property, James May insists that he had no intention of evading his debt liabilities to the IRS or to anyone else; rather, he attributes those decisions to unspecified personal issues relating to his marriage, and not to considerations about debts and creditors. (James May Aff., ¶¶ 13-14.) In this respect, he maintains that the proof is in the pudding, inasmuch as he has fully repaid all of his tax debts from 1989 and 1991. (*Id.*) He specifically asserts that "[t]here was no intent to defraud any creditor, including the revenue service[,] by titling the property to her." (U.S. Exh. 2, at #8.)

_____

was involved, in a hands-on manner, in discussions with the mortgagee concerning a proposed refinance of the Property in 2003 and 2004. (U.S. Exh. 9 & 10.)

[11]    Such gifts are considerable, in light of James May's representation in discovery that his annual adjusted gross income from 1991 through 2004 ranged from roughly $80,000 to roughly $134,000. (U.S. Exh. 2, at #7.)

B.     *James May's Tax Troubles.*

Against the backdrop of the history of the Property, we must project a separate chronology of James May's dealings with the Internal Revenue Service.  There has been no suggestion that Lisa May personally has accrued any back tax liability that might give rise to a tax lien.  That said, it is undisputed that at various times dating back to the 1980s, James May has owed back taxes to the United States Treasury.  A federal tax lien issued by the IRS in March 1992 reflected that "James W and Kay M May" (presumably referring to Kathryn May) jointly owed back taxes totaling $47,911.99 plus accrued interest.  (U.S. Exh. 5.)[12]  Thus, the record is crystal clear that James May had significant unpaid tax liabilities as of February 1989 (when he transferred the Property to Kathryn May) and as of August 1991 (when he caused Kathryn May to transfer title to the Property to Lisa May).[13]  It is equally clear, however, that the tax liabilities referenced in the 1992 lien are not those animating the current dispute.  Rather, James May has since paid in full all tax liabilities that he owed as of February 1989 and August 1991, and that none of those amounts remain outstanding today.  (James May Aff., ¶¶ 13, 14.)  The record does not reflect, however, the precise timing of when he paid the indebtedness set forth in the 1992 tax lien.

In the wake of the 1992 lien, James May continued to experience chronic difficulties with his income taxes.  In October 2003, the IRS issued a tax lien against him individually in the amount of $89,457.87, consisting of 1040 liability for the 1999 tax year in the amount of $34,271.19 and civil penalties from the tax years 1999, 2000 and 2001 totaling $55,186.68.

---

[12]     The gross amount of this liability may be broken down by year as follows: (a) $3,232.44 for the 1984 tax year; (b) $15,166.23 for the 1987 tax year; (c) $11,017.75 for the 1988 tax year; (d) $4,624.10 for the 1989 tax year; and (e) $13,871.47 for the 1990 tax year. (*Id.*)  These amounts were assessed by the IRS at different times, dating back as far as May 1988.

[13]     A 1994 letter from James May's then-counsel relating to his bankruptcy proceedings stipulated that at the time of the divorce James and Kathryn May's joint debts included income tax liability of $47,911.99 plus interest.  (U.S. Exh. 13.)  The joint nature of this indebtedness is underscored by the Judgment of Divorce, which assigns responsibility to James May for paying "all federal and state income taxes which have accrued during the marriage including, but not necessarily limited to, federal income taxes due for the years 1983, 1987, 1988 and 1990."  (U.S. Exh. 4, at ¶ 2.)

-7-

(U.S. Exh. 16.)  In March 2004, the IRS issued another lien against James May in the amount of $73,946.93, based on unpaid tax liabilities arising from his 1995 income taxes ($1,000) and 1998 income taxes ($72,946.93).  (*Id.*)[14]  Neither the October 2003 lien nor the March 2004 lien referenced any tax liabilities of Lisa May, or recited her as the taxpayer against whom the liens were entered.  As such, the 2003 and 2004 liens apply specifically and exclusively to the tax liabilities of James May.  These federal tax obligations, which accrued between 1995 and 2001, were based on separate IRS assessments in November 1996, December 1999, March 2003, and April 2003.  The record reflects that James May and his law firm are and have been making monthly payments (of unspecified amounts) to service these debts, with the intention of paying them off as expeditiously as possible.  (James May Aff., ¶ 15.)

Simply stated, the narrow question presented in this action is whether the tax liens of October 2003 and March 2004 attach to the Property, even though title is held exclusively by Lisa May and not by James May.  On June 10, 2004, the IRS forced the issue by issuing a Notice of Federal Tax Lien (the "Nominee Lien") against "Lisa Clewis May, Nominee of James W May" for the entire $163,404.80 sum of both outstanding tax liens previously issued against James May for the tax years 1995, 1998, 1999, 2000, and 2001.  (Plaintiff Exh. 5.)  The Nominee Lien provides, "This lien attaches to that certain real property as record [*sic*] with the Baldwin County Judge of Probate in Real Property Bk. 452 Page 1557," referring to the Property.  (*Id.*)  Thus, the Nominee Lien seeks to attach the Property to satisfy the unpaid tax liabilities of James May, notwithstanding that the Property is titled solely to Lisa May.[15]  Four months after the

---

[14]      Notices of Federal Tax Liens were duly recorded in the Baldwin County Probate Court for these liens in October 2003 and April 2004, respectively.

[15]      In their affidavits, both James May and Lisa May express in virtually identical language their belief that they "are the victims of a vendetta on the part of the Government because [they] refused to move out of the house and live somewhere else."  (Lisa May Aff., ¶ 9; James May Aff., ¶ 17.)  Of course, statements of speculation or personal belief are generally not proper and are not considered on summary judgment.  *See, e.g., Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002) ("an affidavit stating only that the affiant 'believes' a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact"); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("For factual issues to be considered genuine, they must have a real basis in the record."); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999) (explaining that statements that are

issuance of the Nominee Lien, Lisa May filed this lawsuit in an attempt to defeat that lien.

## III.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment.  *See Gerling Global Reinsurance Corp. of America v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001).  Indeed, the Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("the filing of cross motions on summary judgment does not necessarily indicate that there is no dispute as to a

conclusory or based on conjecture do not satisfy Rule 56(e).  For that reason, the Court lends no weight to speculative statements concerning what Lisa and James May believe the Government's motivations for the Nominee Lien might have been.

material fact, or have the effect of submitting the cause to a plenary determination on the merits").  However, it is also true that cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts.  *Oakley*, 744 F.2d at 1555-56.  This is just such a case.

**IV.    Analysis.**

The Government proffers two theories under which it contends the Nominee Lien attaches to the Property, despite the fact that the Property is titled to Lisa May and not James May.  First, the Government would rely on the nominee doctrine, a common-law theory pursuant to which federal tax liens attach to a taxpayer's property that is titled to the taxpayer's nominee.  Second, the Government maintains that James May fraudulently transferred the Property, initially to Kathryn May and then to Lisa May, with the actual intent of hindering, delaying or defrauding the IRS's efforts to collect the back income taxes and penalties that he owed.

**A.    *The Government's Nominee Theory.***

The Tax Code provides as follows: "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount ... shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."  26 U.S.C. § 6321; *see also United States v. Towne*, 406 F. Supp.2d 928, 932 (N.D. Ill. 2005) ("A federal tax lien attaches to all property and rights to property, whether real or personal, that belong to a taxpayer.").  The statutory language "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have."  *United States v. National Bank of Commerce*, 472 U.S. 713, 720, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985).  "The lien arises in favor of the government at the time an assessment of the unpaid taxes is made against the delinquent taxpayer."  *Horton Dairy, Inc. v. United States*, 986 F.2d 286, 290 (8th Cir. 1993).

At issue in this case, of course, is the Government's utilization of this tax lien procedure against the Property, title to which is held by Lisa May.  The rub that precipitated this litigation is that § 6321 plainly applies only to property and rights to property belonging to the delinquent taxpayer.  Simply put, then, the key question is whether James May has a property right or ownership interest in the Property.  If so, then the Nominee Lien is valid and proper.  If not, then it is not (unless the underlying transfer was fraudulent under Alabama law, which is a separate and analytically distinct question).

-10-

In asserting that James May has an ownership interest in the Property, the Government argues that Lisa May is his nominee and that the Property is therefore subject to James May's tax liens.  It is beyond cavil that "[p]roperty of the nominee or alter ego of a taxpayer is subject to the collection of the taxpayer's tax liability."  *Shades Ridge Holding Co. v. United States*, 888 F.2d 725, 728 (11th Cir. 1989).[16]  "A court presented with a nominee or alter ego claim attempts to discern whether a taxpayer has engaged in a sort of legal fiction, for federal tax purposes, by placing legal title to property in the hands of another person or entity while, in actuality, retaining all or some of the benefits of being the true owner."  *Sumpter v. United States*, 302 F. Supp.2d 707, 721 (E.D. Mich. 2004).  The nominee theory is designed "to determine whether property should be construed as belonging to the taxpayer if he/she treated and viewed the property as his/her own, in spite of the legal machinations employed to distinguish legal title to the property."  *Baum Hydraulics Corp. v. United States*, 280 F. Supp.2d 910, 916 (D. Neb. 2003) (citation omitted).  Under this doctrine that has emerged in federal jurisprudence, the Government would have the Court apply a patchwork of factors from other jurisdictions in order to ascertain whether Lisa May holds the Property as the nominee of James May.

> **B.   *Whether Alabama Law Recognizes a Property Interest.***

Plaintiff responds that the Government's analysis is fatally flawed because it glosses over the threshold requirement that James May must have a cognizable interest in the Property under Alabama law before his federal tax lien can attach to it.  This requirement is a correct statement of law.  Indeed, "[t]he federal tax lien statute itself creates no property rights but merely attaches

---

[16]   *See also G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977) (explaining that petitioner's assets may properly be regarded as taxpayer's property for purposes of federal tax lien if petitioner is taxpayer's alter ego); *Macklin v. United States*, 300 F.3d 814, 818 n.2 (7th Cir. 2002) ("In the case of a nominee lien, the IRS proceeds against an alter ego or nominee of a delinquent taxpayer for the purposes of satisfying the taxpayer's obligations.") (citations omitted); *F.P.P. Enterprises v. United States*, 830 F.2d 114, 118 (8th Cir. 1987) ("Property held in the name of an entity which is the alter ego of a taxpayer may be levied on to satisfy the tax liabilities of the taxpayer."); *United States v. Dawes*, 344 F. Supp.2d 715, 721 (D. Kan. 2004) ("even when legal title may be held by others, a taxpayer may be found to be an equitable owner"); *Sumpter v. United States*, 302 F. Supp.2d 707, 720 (E.D. Mich. 2004) ("where property is placed in the name of another as the taxpayer's alter ego or nominee, the lien attaches to the property ... [such that] the United States can enforce a taxpayer's liability for taxes against property held for him by his nominee or alter ego").

consequences, federally defined, to rights created under state law." *United States v. Craft*, 535 U.S. 274, 278, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002).[17]  Thus, courts "look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *Id.*  If the individual rights that, in certain combinations, may constitute property are a "bundle of sticks," then "[s]tate law determines only which sticks are in a person's bundle.  Whether those sticks qualify as 'property' for purposes of the federal tax lien statute is a question of federal law." *Id.* at 278-79; *see also United States v. Murray*, 217 F.3d 59, 63 (1st Cir. 2000) (while state law determines what interest a taxpayer possesses in property, "federal law determines *whether* that state-law-created interest constitutes 'property' or 'rights to property' under the federal lien statute").  Lisa May opposes the Government's Rule 56 motion on the nominee theory, and seeks summary judgment on that theory herself, on the ground that James May lacked any interest in the Property under Alabama law.

To buttress her point, plaintiff claims that James May cannot own an interest in the Property because she "is the title holder and Alabama bases ownership on title."  (Plaintiff's Proposed Findings and Conclusions, at ¶ 32.)[18]  This generality vastly oversimplifies Alabama property law.  More importantly, Lisa May overlooks a critically significant strand of Alabama case law recognizing that one spouse may possess a lingering cognizable interest in a property even after deeding it to the other spouse as a purported gift.  While Alabama law "may presume that the property is given to a wife when the title is placed in her name, this is only a rebuttable presumption." *Taylor v. Peoples Fertilizer Co.*, 117 So.2d 180, 188 (Ala. 1960).  Such a

---

[17]     *See also National Bank of Commerce*, 472 U.S. at 722 ("[I]n application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property."); *Spotts v. United States*, 429 F.3d 248, 251 (6th Cir. 2005) ("A federal tax lien does not arise or attach to property in which a person has no interest under state law."); *Towne*, 406 F. Supp.2d at 932 ("A federal tax lien, however, does not attach to property in which a taxpayer has no interest under state law.").

[18]     In support of this proposition, plaintiff points to *Cooper v. Cooper*, 266 So.2d 871 (Ala. 1972), wherein the Alabama Supreme Court observed that "[p]rima facie, the status of real property is precisely as indicated by the muniment of title." *Id.* at 878.

-12-

presumption may be rebutted by a showing of the parties' real intent, in which case Alabama law finds a continuing property interest on behalf of the husband.  The *Taylor* court deemed the presumption rebutted where the plaintiff had purchased property while heavily in debt and had placed such property in his wife's name to prevent creditors from levying on it.  Based on these facts, the Alabama Supreme Court concluded that, notwithstanding the muniment of title in the wife's favor, the property belonged to the plaintiff and was therefore subject to his debts.  *Id.* *Taylor* is hardly unique in Alabama jurisprudence.  *See also McLain v. McLain*, 409 So.2d 852, 854 (Ala.Civ.App. 1981) (finding no abuse of discretion where trial court concluded that property given by husband purportedly as a gift to wife remained marital property, where the parties continued to use it as their joint abode and where the husband's purpose in effecting the transfer was to effect a marital reconciliation); *Cox v. Cox*, 395 So.2d 1027, 1029-30 (Ala.Civ.App. 1981) (husband retained a one-half interest in house after transferring title to wife, where purpose of transfer was to preclude former wife from obtaining lien on it and parties' real intent was to hold title jointly); *see generally Snow v. State*, 60 So.2d 346, 348-49 (Ala. 1952) (finding that even though sister held record title to property and transfer was not made for purposes of tax evasion, her brother was taxpayer responsible for property because he exercised right of control over property, received its benefits, and sister was holding title as mere accommodation to insulate property from potential lawsuits against brother).

These cases demonstrate that Alabama law does, in fact, recognize that an individual may retain a property interest in land that has been deeded to his spouse or other close family member, where the parties' real intent is for the individual to remain a beneficial owner of such property.[19]  Plaintiff's argument to the contrary is mistaken.

**C.**     ***Application of Nominee Theory to the Property.***

In light of the foregoing, then, the critical inquiry becomes whether the presumption of a gift can be rebutted here by evidence of the parties' "real intent."  There is no direct evidence of

_____

[19]     This line of authority undercuts plaintiff's strident assertion that the Government is asking this Court "to judicially create a law which allows a federal agency to confiscate private Alabama residential real property, depriving Alabama citizens of their hearth and home, where no state statute or case law exists on the point."  (Plaintiff's Opposition Brief (doc. 81), at 16.)  The requisite on-point caselaw plainly exists.

"real intent," in terms of whether it was intended that James May would remain a beneficial owner of the Property notwithstanding his putative "gift" to Lisa May.[20]  Therefore, the Court must turn to circumstantial evidence to assess their intent.  How is such evidence to be evaluated?  Alabama case law is not well developed, consisting only of shadowy guidance that the parties' real intent is "reflected in the conditions and circumstances attending the transaction." *Cone v. Cone*, 331 So.2d 656, 658 (Ala. 1976) (citation omitted).[21]

Fortunately, the questions of whether a taxpayer had the "real intent" to gift property to his spouse and, alternatively, whether the parties intended that the taxpayer would remain a beneficial owner of such property under Alabama law are substantively indistinguishable from the question of whether the taxpayer's spouse is his nominee under federal law.  *Compare Cody v. United States*, 348 F. Supp.2d 682 (E.D. Va. 2004) (explaining that nominee analysis is

----

[20]    At most, plaintiff offers a conclusory statement that James May "wanted to make a wedding gift of the Property." (James May Aff., ¶ 9.)  Similarly, Lisa May attests in conclusory fashion that the Property "was a wedding gift from Jim." (Lisa May Aff., ¶ 4.)  This testimony sheds no light on the "real intent" of the parties, as required by Alabama law, but simply confirms the unremarkable and unilluminating fact that the parties now label the transaction a "gift."  Likewise, James May's statement that, following the "gift," he has "always regarded the Property as Lisa's" (James May Aff., ¶ 12) is too vague, too ambiguous, and too obscure to be reasonably classified as an expression that he intended to relinquish all of his beneficial rights and interests in the Property.  And even if it could be so construed, plaintiff has never articulated that argument to this Court.  In any event, that statement leaves unanswered whether James May intended to continue, or whether he has continued, to exercise dominion and control over the Property, to reap its benefits and to chart its course after the transfer occurred.  Therefore, the Court must dig deeper on summary judgment.  Given the Government's extensive arguments that James May retained an ownership interest in the Property, plaintiff was squarely on notice that the Mays' intentions as to James May's interest in the Property were at issue on summary judgment.  Yet she remained silent on this point, proffering neither direct evidence nor argument that James May's real intent was that he would have no say in, rights to, responsibility for, or beneficial ownership interest of any kind in the Property after he deeded it to Lisa May, much less that he intended for Lisa May to be free to do whatever she wanted with the Property without input, interference or restrictions from him.  In the absence of such evidence, the Court must turn to circumstantial evidence to assess the parties' intentions.

[21]    The parties concur that "no state or federal court in Alabama has definitively set forth the factors to be considered in determining whether an individual holds property as the nominee of another." (U.S. Opposition Brief (doc. 91), at 9; Plaintiff Reply Brief (doc. 92), at 2.)

-14-

"aimed at ferreting out the true ownership of the property") *with McLain*, 409 So.2d at 853-54 (examining whether parties really intended for property to be a gift, and relying on temporal proximity of transfer to parties' divorce, as well as fact that parties continued using property as joint home after it was deeded to wife).  The Alabama "real intent" issue in the spousal gift context is thus a variant of the nominee doctrine prescribed in other jurisdictions, even though it is known by a different appellation in this state.[22]

Federal courts confronting nominee issues have routinely used the law of other jurisdictions to flesh out amorphous or ill-defined state standards for determining nominee status.  *See Cody*, 348 F. Supp.2d at 694 ("federal courts sitting in states whose law of nominee ownership is similarly undeveloped have typically looked to nominee ownership criteria employed in other federal tax collection cases"); *Baum Hydraulics*, 280 F. Supp.2d at 916 (being unable to locate clear definition or application of nominee theory in Nebraska, court consults case law from other jurisdictions); *LiButti v. United States*, 968 F. Supp. 71, 75 (N.D.N.Y. 1997) (where no reported New Jersey cases address factors relevant to nominee theory, court applies factors used by other federal courts considering such theory); *Towe Antique Ford Foundation v. I.R.S., Dep't of Treasury, U.S.*, 791 F. Supp. 1450, 1454 (D. Mont. 1992) (applying legal authorities from other states, where Montana courts had not set forth relevant factors in

---

[22]     It would be erroneous to focus on the label applied to the doctrine by Alabama courts, as opposed to its substance.  Plaintiff does just that, arguing "that Alabama does not recognize nominee liens at all."  (Plaintiff's Principal Brief, at 3.)  There is, indeed, no Alabama decisional authority that explicates a "nominee doctrine" as such.  But federal appellate courts have deemed state law to bear on the nominee question even when the state courts have called it something else.  *See, e.g., Spotts*, 429 F.3d at 253 (opining that "Kentucky law does have law that provides guidance on nominee theory, though it discusses the theory using the term 'constructive trust'"); *Scoville v. United States*, 250 F.3d 1198, 1202 (8th Cir. 2001) (looking to Missouri law of fraudulent conveyance for purposes of evaluating state standards for nominee liability); *see generally United States v. Stinson*, 386 F. Supp.2d 1207, 1218 (W.D. Okla. 2005) (looking at Oklahoma fraudulent conveyance principles in evaluating nominee argument).  For that reason, the undersigned will accord no talismanic significance to the magic words "nominee doctrine," nor will it infer from their absence that Alabama authorities fail to recognize a theory akin to that which federal courts have labeled "nominee doctrine."

determining whether business entity is individual's nominee).[23]  This Court will do the same by examining nominee factors from other jurisdictions to evaluate the parties' "real intent" vis a vis ownership of the "gift" Property under Alabama law.  To be clear, the Court is not using federal law to create new property rights under Alabama law, but is instead (like the above-cited cases) using federal law to supply standards for evaluating property rights already recognized under Alabama law.

The relevant factors for the nominee query are accurately delineated in *Cody v. United States*, 348 F. Supp.2d 682 (E.D. Va. 2004), as follows: "(1) whether the taxpayer expended personal funds for the property; (2) whether inadequate or no consideration was paid by the alleged nominee; (3) whether the property was placed in the alleged nominee's name in anticipation of a lawsuit or other liability; (4) whether the taxpayer enjoys the benefits of, retains possession of, and exercises dominion and control over the property; (5) whether a close family relationship exists between the taxpayer and the alleged nominee; (6) whether conveyances between the taxpayer and alleged nominee were recorded; and (7) whether the alleged nominee interferes with the taxpayer's use of the property."  *Id.* at 694-95; *see also Sumpter*, 302 F. Supp.2d at 721 (summarizing relevant considerations as being whether inadequate or no consideration was paid, whether property was transferred in anticipation of liability, whether close relationship between parties exists, whether conveyance was recorded, whether transferor

---

[23]      The justification for considering precedents from other jurisdictions in evaluating whether Lisa May is the nominee of James May is rendered even more compelling by *Shades Ridge Holding Co. v. United States*, 888 F.2d 725 (11th Cir. 1989).  In *Shades Ridge*, a case originating in Alabama, the Eleventh Circuit declared that, in comparing federal and state law on whether a party is a nominee or alter ego for tax liability purposes, "the standards are so similar that the distinction is of little moment."  *Id.* at 728; *see also Scoville*, 250 F.3d at 1202 (citing *Shades Ridge* for proposition that federal and state laws apply same basic notion in determining whether someone acts as a nominee); *Cody*, 348 F. Supp.2d at 694 (similar).  Plaintiff argues that *Shades Ridge* is distinguishable because it involved a "notorious gambler," such that it is "no ... wonder" that fraudulent intent was found.  (Plaintiff's Opposition Brief (doc. 81), at 16; Plaintiff's Suggested Findings of Fact, ¶ 35.)  This contention misses the point.  *Shades Ridge* is germane to this analysis for the legal principles it enunciates, not for the manner in which it applies those principles to specific facts.  That the facts here may substantially diverge from those in *Shades Ridge* in no way detracts from the utility of *Shades Ridge* in setting forth the Eleventh Circuit framework for this type of analysis.

retained possession, and whether transferor continued to enjoy benefits of property).  At all times, the critical issue is whether the taxpayer has active or substantial control over the property.  *See Shades Ridge*, 888 F.2d at 728; *Scoville v. United States*, 250 F.3d 1198, 1202 (8th Cir. 2001) (basic notion for determining whether nominee exists turns on who has active or substantial control); *In re Richards*, 231 B.R. 571, 579 (E.D. Pa. 1999) (overriding consideration is whether taxpayer exercised active or substantial control over property); *Baum Hydraulics*, 280 F. Supp.2d at 916-17 (similar).  That said, however, courts must not apply these factors rigidly or mechanically.  *See Spotts v. United States*, 429 F.3d 248, 253 n.2 (6th Cir. 2005) (cautioning that "rigid adherence to these factors may not be appropriate in every case"); *Richards*, 231 B.R. at 579 (similar).[24]

Considering the summary judgment record in the light most favorable to plaintiff, the pertinent factors militate heavily in favor of a finding that Lisa May is the nominee of James May as to the Property.[25]  First, it is undisputed that James May expended personal funds for the Property, inasmuch as he has ultimately paid every penny for mortgages, utilities and renovations since at least 1991.  By contrast, Lisa May has expended no such funds, save for applying a $100,000 gift (from James May) and a mortgage loan (which James May is repaying) for home renovations.  Second, Lisa May has at no time paid any consideration to anyone for the Property.  Third, the record establishes that James May has continued to enjoy the full complement of incidences of dominion, ownership and control over the Property at all relevant

---

[24]      The Court also bears in mind the Sixth Circuit's admonition that the nominee factors may be "less probative" in cases of married couples, in terms of "distinguishing tax shams from legitimate titling decisions between spouses."  *Spotts*, 429 F.3d at 253 n.2.  Plaintiff's problem is that she proffers no evidence that it was a "legitimate titling decision[]  between spouses," other than James and Lisa May's mere naked characterization of it as a "gift."  Had plaintiff wished to argue that this was a legitimate titling decision, then it was incumbent on her to present evidence to support that proposition (*i.e.*, to explain the reasons animating that decision or to show that she and her husband have treated the Property in a manner consistent with its nominal titling status during the intervening 15 years).  This she has not done.

[25]      Plaintiff's briefs do not address these factors, but simply dismiss them out of hand as inapplicable because of her belief that Alabama law can confer no property right to James May.  This argument having been rejected, and plaintiff having offered no fallback position, this Court does not have the benefit of plaintiff's analysis or application of the nominee factors.

times.  He has resided at the Property continuously since 1985.  He has been actively involved in dealings with the Property's mortgage lenders.  He has appeared on mortgage documents as a mortgagor for the Property.  He has paid all utilities and taxes on the Property.  He has bankrolled extensive renovations of the Property.  Fourth, James May and Lisa May are husband and wife, which obviously constitutes a close family relationship.  Fifth, there is not a shred of evidence that Lisa May has at any time interfered with or curtailed in any respect James May's use of the property.[26]  Sixth, James May failed to record Kathryn May's conveyance of the Property back to him at the time of their 1991 divorce, but instead directed that she deed the Property directly to Lisa May, even as he acknowledged "that technically [he] got the house." (U.S. Exh. 14, at 2.)  That James May "got the house" from Kathryn May but structured the conveyance in such a manner to leave his name off the title is a factor that supports an inference that Lisa May is James May's nominee.

As for the final nominee factor, there is a genuine issue of material fact as to whether the Property was placed in Lisa May's name in anticipation of a lawsuit or other liability.  The Government's evidence is that the IRS had assessed tens of thousands of dollars of back tax liability against James May before he orchestrated the transfer of the Property to Lisa May in 1991.  This evidence raises a reasonable inference that James May placed the Property in Lisa May's name in anticipation of his own tax liabilities.  However, James May avers that he did not transfer the Property to Lisa May "with the intention of to [*sic*] avoid paying taxes or to avoid any other debt," but that "the deed to Lisa was about her and [his] marriage."  (James May Aff., ¶ 13.)  If believed, that evidence would support a conclusion that James May did not transfer the Property in anticipation of lawsuits or other liability.  For purposes of the Government's Rule 56 Motion, plaintiff's evidence is credited and all reasonable inferences are drawn in her favor. Therefore, the Court assumes, without finding, that James May did not transfer the Property to Lisa May with the intention of avoiding his IRS liabilities or other debts.

Stepping back from the trees to scrutinize the forest, the Court is reminded that, far from

---

[26]    Plaintiff derides the Government's arguments on this point as "pure speculation made by a party who has never spent any time at the May home."  (Plaintiff's Opposition Brief (doc. 81), at 9.)  However, plaintiff neither challenges the veracity of the underlying statement nor submits record evidence tending to show that it is incorrect.

a mechanical checklist of factors, the "ultimate inquiry" in any nominee analysis is whether the taxpayer or the purported nominee is "the true beneficial owner of the property."  *Spotts*, 429 F.3d at 253 n.2.  Based on the facts and circumstances presented in the record, the only reasonable inference that may be drawn is that James May remains to this day a true beneficial owner of the Property.  Although he titled the Property in the name of his wife, James May received no consideration for that transfer.  He has continuously resided at the Property since 1985, with unfettered enjoyment of the benefits of home ownership.  During that time, James May has also continuously borne the burdens of home ownership for the Property.  His name is on the mortgage as a mortgagor, and the utilities are exclusively in his name.  Subsequent to the 1991 transfer, James May has paid every penny of every mortgage, property tax and utility payment that has been made for the Property, with no contributions from Lisa May whatsoever. When the Property was substantially renovated in 1999, James May alone footed the bill. Additionally, it is quite clear that James May is and remains actively involved in major decisions concerning the Property, as the record includes several instances in which he negotiated or otherwise communicated with lenders and no instances in which Lisa May did so.  By contrast, plaintiff has not proffered a shred of evidence that Lisa May's role with respect to the Property extends beyond living in it with James May and nominally holding title to it.  There is no evidence that she either receives or pays the bills.  There is no evidence that she is active in dealing with lenders and other service providers concerning the Property.  There is no evidence that she makes any decisions about the Property, or that she has taken or could take any significant action with respect to the Property without James May's approval or acquiescence.[27]

Considering all of the foregoing, the Court finds no genuine issues of fact as to James May's ownership interest in the Property under Alabama law.  On the evidence submitted, the Government has conclusively rebutted the Alabama presumption that James May gave the Property to Lisa May as a gift.  In particular, the Government has presented uncontroverted

---

[27]  Perhaps plaintiff possesses evidence that might establish these considerations. But she has placed no such evidence in the record, and has done nothing to rebut the Government's showing that James May remains the true, beneficial owner of the Property.  The Court must decide matters before it based on the facts that the parties have actually placed in the record, without regard to facts that might have been (but were not) presented.

evidence that the parties' real intent (borne out by 15 years of experience following the purported "gift") was for James May to retain the incidences of ownership and control, and to retain a beneficial ownership interest in the Property.  Plaintiff has offered no evidence that might raise a reasonable inference to the contrary.  Viewing the record in the light most favorable to plaintiff, the undersigned determines that James May has held and presently holds an interest in the Property which is cognizable under Alabama law, in accordance with the *Taylor*, *McLain*, *Cox*, *Cone* and *Snow* lines of precedent.  Having ascertained that James May possesses the requisite property interest under Alabama law, the question then becomes "whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *Craft*, 535 U.S. at 278.  This question is quite straightforward.  Section 6321 of the Tax Code "reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *National Bank of Commerce*, 472 U.S. at 720.  Moreover, it is plain (and plaintiff offers no evidence or argument to dispute) that James May's state-law interest in the Property falls squarely within the parameters of the federal nominee doctrine, such that his interest in the Property is unquestionably reachable via federal tax lien, irrespective of the fact that the Property is titled to Lisa May.  Accordingly, it is the finding of this Court, as a matter of law, that Lisa May holds title to the Property as James May's nominee, and that the IRS tax liens against James May attach to the Property.[28]

V.      **Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.      The Government's Motion for Summary Judgment (doc. 77) is **granted** on the ground that there are no genuine issues of material fact that (a) James May holds an interest in the Property under Alabama law; (b) that state-recognized interest qualifies as a right to property under federal tax lien legislation; and (c) plaintiff holds title to the Property as the nominee of James May, such that the tax liens against James May properly attach to the Property.

---

[28]     In light of this determination, it is unnecessary to reach the Government's alternative argument that James May fraudulently transferred the Property to Kathryn May in 1989 and again fraudulently transferred the Property to Lisa May in 1991, in violation of the Alabama Uniform Fraudulent Transfer Act ("AUFTA"), Ala. Code §§ 8-9A-1, *et seq*.

2.      Plaintiff's Motion for Partial Summary Judgment (doc. 88) is **denied** for the same reasons.

3.      Plaintiff's claims against the United States are **dismissed with prejudice**, and plaintiff shall take nothing from the United States by her Complaint.

4.      Because of this ruling, plaintiff's only remaining causes of action are *in rem* claims against defendant A Parcel of Land, and *in personam* claims against defendants John L. House, Shirley House and James W. May.  Plaintiff is to notify the Court in writing, on or before **September 19, 2006**, whether she intends to proceed to trial against those remaining defendants and, if so, what the triable issues might be and what the federal subject-matter jurisdictional basis of those triable issues might be.

DONE and ORDERED this 6th day of September, 2006.


                                        s/ WILLIAM H. STEELE
                                        UNITED STATES DISTRICT JUDGE